Pages 1 – 21

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON

GREGORY SHADE,                        )
                                      )
            Plaintiff,                )
                                      )
  VS.                                 )   No. C 08-3471 SI
                                      )
DANIEL PATRICK GORMAN                 )
individually and doing business as    )
CHARLIE SEVEN FILMS, LLC,             )
FRAMEBIRD MEDIA, CHIP R. BEASLEY,     )
and ANDREW ELLIS,                     )
                                      )   San Francisco, California
            Defendants.               )   Friday
_____)   December 12, 2008


### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**For Plaintiff:**          SIDEMAN & BANCROFT LLP
                            One Embarcadero Center, 8th floor
                            San Francisco, California  94111
                    **BY:  ROBERT R. CROSS, ESQUIRE**
                          **CONSTANCE J. YU, ESQUIRE**


**For Defendant:**          Farella, Braun & Martel LLP
                            235 Montgomery Street, 30th floor
                            San Francisco, California  94104
                    **BY:  DEEPAK GUPTA, ESQUIRE**
                          **ANTHONY SCHOENBERG, ESQUIRE**
                          **JULIE WAHLSTRAN, ESQUIRE**


**Reported By:**    *Katherine Powell Sullivan, CSR # 5812*
                    *Official Reporter - U.S. District Court*

<pre>
 1                    P R O C E E D I N G S

 2  DECEMBER 12, 2008                              10:15 A.M

 3

 4           THE CLERK:  Calling civil 08-3471, Gregory Shade

 5  versus Daniel Gorman.

 6           Counsel needs to please approach the podium and state

 7  your appearance for the record.

 8           MR. GUPTA:  Your Honor, Deepak Gupta appearing for

 9  Daniel Gorman, the defendant.

10           THE COURT:  Good morning.

11           MR. GUPTA:  Along with me is Tony Schoenberg.

12           MR. SCHOENBERG:  Good morning.

13           THE COURT:  Good morning.

14           MR. GUPTA:  Also, Julie Wahlstrand appearing for the

15  defendant.  And Daniel Gorman, as well.

16           THE COURT:  Good morning.

17           MR. CROSS:  Your Honor, Robert Cross and Constance Yu

18  for the plaintiff, Greg Shade.

19           THE COURT:  Good morning.

20           Well, there are a number of motions on.  They have

21  been briefed.  We have reviewed them.  We've reviewed the

22  materials submitted.

23           Is there anything that you all would like to add?

24  Let's see.  It's mainly -- well, plaintiff is the motion for

25  preliminary injunction.  Defendant is all the motions to
</pre>

1   dismiss and strike.

2          I'll be happy to hear whatever any of you want to

3   add.

4          **MR. GUPTA:**  Well, Your Honor, first, in relation to

5   our opposition to the motion for preliminary injunction, I

6   think a very key issue here is to give weight to the

7   significance of Mr. Gorman's work.

8          He's created a short film.  It's a nonprofit film

9   that addresses an issue that's very important.  It's very

10  current.  And it's something that is in the public interest.

11         His movie is about public -- private armies fighting

12  the War on Terror.  And he does it through a case study.  The

13  case study is of the plaintiff, Mr. Gregory Shade.

14         With the trial going on now in Salt Lake City, we see

15  that private armies like Blackwater are an important current

16  issue.

17         What you'll find is that the fair use doctrine is

18  designed precisely to accommodate First Amendment concerns.

19  And for that reason, this type of movie falls squarely within

20  the core of that doctrine.

21         Now, on the motion to dismiss, Your Honor, if you

22  have some further questions on that I'll move on, but I'd like

23  to add one more point on the copyright opposition motion

24  preliminary -- our opposition to his motion for preliminary

25  injunction.  And that's on the ownership issue.

```
1              On this, Your Honor, plaintiff has been an absolute

2    moving target.  He has to show three things to get a

3    preliminary injunction.  One, that he owns a copyrighted issue.

4    Two, that there's an infringement.  Which is disproved by fair

5    use.  And, three, that there's irreparable injury.  The latter

6    (incomprehensible) in the Winter vs. NRCD case, by the Supreme

7    Court.

8              (Reporter interrupts.)

9         MR. GUPTA:  Sorry.

10             But on the ownership issue, he's been an absolute

11   moving target.  If you look at paragraph 15 of his complaint,

12   the allegation is that Gorman created, compiled and edited the

13   work that is allegedly infringed, which he calls the compiled

14   video footage, which Gorman has testified and has provided

15   testimony that's largely undisputed, was a Congressional

16   documentary.

17             It was a work that Gorman created.  He authored it.

18   He took 19 hours of footage, boiled it into a few videotapes,

19   which the plaintiff and Gorman took to Capitol Hill and shared

20   with various congressmen to illustrate the activities and

21   travels of Mr. Shade.

22             Now, Mr. Shade's claim for ownership in his complaint

23   for that material is based on a work-for-hire allegation.  In

24   deposition it was clear there is no work-for-hire claim here

25   that can be supported, because the Supreme Court precedent is
```

1    clear that you need to have a written agreement in this type of

2    situation.  And he doesn't have that type of agreement.

3           He admitted Gorman was an independent contractor, it

4    was all taken at -- all worked on in Gorman's studio.  So

5    Gorman is the author.  He took the raw reality footage, turned

6    it into a work that -- of which he is the author.

7           **THE COURT:**  What is the relationship between the raw

8    reality footage and the completed work, as a legal proposition?

9           **MR. GUPTA:**  Well, there's -- there's the raw reality

10   footage, which was taken in Central Asia and the Middle East.

11   That was brought back -- by the way, that was taken by a number

12   of various Afghani people who actually were working the camera,

13   and that sort of thing.  So there's an open question as to

14   whether Shade can even claim ownership of that.  That's

15   governed by Afghani law.  You'll find nothing on Afghani law in

16   their papers.

17          And the Itar case that we cite establishes that it's

18   the site as to where the work was created that defines

19   ownership.  That, he brings back.  He says, hey, I'm a

20   businessman.  I had ideas about the War on Terror.  I'm not a

21   moviemaker.

22          He goes to Gorman and says, Boil this down into a

23   four hour or so piece that we can share with people, that will

24   have some audience appeal.

25          Gorman does that.  Gorman goes through it.  He

1  selects the best stuff.  He edits it.  He compiles it.  He

2  directs voice-overing of that.  He includes music in that.  And

3  he makes it something that, you know, a congressperson or CNN,

4  et cetera, would be able to sit down and watch.  It's not just

5  19 hours of raw.

6          That material was taken by them, the two of them, to

7  Capitol Hill.  They shared it with Congress.  They give it to

8  CNN and they give it to Discovery Channel, hoping it will be

9  rebroadcast.

10         **THE COURT:**  Now, as to that, who, if anyone, do you

11 think owns the copyright?

12         **MR. GUPTA:**  It's our contention that Gorman is the

13 author of that work.  Under the copyright, he's the owner of

14 that work.  That is the work that is allegedly infringed.

15         So if you look at paragraph 33 of the complaint,

16 they're saying, well, it's this compiled video footage that was

17 created, quote, as a work for hire.  Turns out there's no

18 work-for-hire agreement that Gorman infringes.  Gorman can't

19 infringe the work that he's the author of, when there's no work

20 for hire even in place.

21         So, now, after this all comes to light, complete

22 180-degree turn, and Gorman didn't substantially contribute to

23 the work at all.  And I don't think it's a tenable argument.

24         They put in two surprise witnesses on reply, that we

25 had to surreply to.  And the surprise witnesses are notably

1   very vague on what they did, what Gorman did, if it's even the

2   same work.

3           So at the end of the day, Gorman can't infringe what

4   he authored.  Major question on ownership.

5           Now, independent and beyond that is this issue of

6   fair use, whether or not he can establish ownership of

7   something, or the whole thing, or whatever.

8           We've got a short film here that uses about ten

9   minutes of footage.  He repeatedly admitted in deposition that

10   20 minutes was a small amount.  The key factors under the fair

11   use analysis are the transformativeness of the use and the

12   effect on the market.

13           There is really no dispute that this work is

14   transformative.

15           **THE COURT:**  That might be the heart of the problem

16   here.  It came out differently, I think, from what the

17   plaintiff expected.

18           **MR. GUPTA:**  Oh, it sure did.  In fact, that's --

19   that's sort of the inherent contradiction or the inherent

20   problem, the Achilles heel, of this whole case.

21           Because what you have is, by definition what's

22   upsetting to him about it is that, look, this casts him -- it

23   criticizes his position or it criticizes his activities.

24           And, by definition, under the preamble of the fair

25   use doctrine, criticism is within the court of fair use.

1    Particularly, broad use is accorded to political speech.  And

2    the Wajnarowitz (phonetic) case is a very good example of that.

3              Recently, Albert v. Aschcroft, the Supreme Court

4    repeated that the First Amendment is enshrined in the fair use

5    doctrine.  And if you look at cases like Virginia vs. Black,

6    political speech is at the core of the First Amendment.

7              The public interest is also implicated here.  We're

8    talking about public funding.  We're talking about how we're

9    going to protect the country.  We're talking about core public

10   issues.

11             And the Diebold case, which dealt with voting

12   machines, is a very similar case that's on point, where this

13   was given weight in the first factor when you're talking about

14   the purpose and character of the use under the fair use

15   analysis.

16             Plaintiff can't dispute that this is reality footage.

17   Therefore, under the second factor, which is the nature of the

18   work, we have some very strong arguments that this is -- has

19   very weak copyright protection.

20             Moreover, plaintiff may try to argue that, well, this

21   wasn't published work.  But the fact is, the work was

22   distributed to multiple news outlets.  It was distributed at

23   Congress.  There is really no question about publication.

24             Moreover, in the Diebold case you'll see language to

25   the effect where an e-mail archive was published in the public

```
 1   interest.  It's not -- the publication factor is not applicable

 2   when there is no intention to publish the work at issue.  He's

 3   repeatedly stated in deposition he has no intention to publish

 4   this work.

 5          In reply, plaintiff said, well, this is the heart of

 6   the work.  And so because it's the heart of the work, you know,

 7   this -- the third factor, the fair use analysis, is in his

 8   favor.  And that just can't be the case.

 9          The heart of the work, first of all, as a matter of

10   fact, is not present when you're talking about 19 hours of

11   reality footage.  There is no heart of the work.  And, in any

12   event, this -- the heart of the work factor does not actually

13   carry the day when you basically have only as much use as is

14   necessary to convey your point.

15          And that's what Gorman did here.  Gorman copied as

16   much as was necessary to convey his point.  Which is to conjure

17   up this three-layer portrayal of kind of a news -- a news

18   portrayal of Shade and his War on Terror, which is something of

19   a sugar-coated view of things.  What Shade was actually doing,

20   which starts to peek the audience's interest as to, well, is he

21   winning their hearts and minds, or is he very naive and

22   essentially untrained?

23          And then the third layer being this very troubling

24   interview footage to the effect that he's assembling a private

25   Army, he has his intention, he wants to work with the
```

1  government of the United States to do this, it's going to cost

2  him $50,000.  And he's essentially going to be judge, jury and

3  executioner.  So you have that type of footage.

4          In that third layer you also have, for example,

5  quotes from Congressman Rohrabacher, to the effect that

6  patriots are mercenaries, and Greg is the ultimate patriot.

7          Well, that's a thinly-veiled implication that Shade

8  is a mercenary.  Whether it's true or not, it's meant to make

9  the audience think about an issue that is very, very current

10 and very, very important.

11          Finally, the effect on the market prong.  Here I

12 would point the Court to Diebold, Campbell, and Perfect 10.  In

13 Diebold, the Court specifically said that, in the Northern

14 District -- well, Diebold has identified no specific commercial

15 purpose or interest affected by publication of the e-mail

16 archive, and there is no evidence that such publication

17 actually had or may have any effect on the putative market

18 value, if any, of Diebold allegedly copyrighted material.

19          Even if it is true that portions of the e-mail

20 archive have commercial value, there is no evidence that

21 plaintiffs have attempted or intended to sell copies of the

22 e-mail archive for profit.

23          Here, in deposition, Mr. Shade stated numerous times

24 that he's received absolutely no benefit from it; he has no

25 intention of using this material.  And so this factor

1    manifestly weighs in favor of Gorman as well.

2                **THE COURT:**  Okay.  I need to ask you to wrap up.

3                **MR. GUPTA:**  Okay.  Your Honor, plaintiff -- one of

4    their arguments is, well, this is somehow a violation of the

5    parties' letter of intent.

6                The letter of intent was a one-week agreement.  It

7    has no force today.  It related to something very specific.  It

8    related to a possible commercial venture.  They were saying,

9    Let's talk about using all of this footage for a possible

10   commercial venture.  Let's talk about using this footage in

11   ways that may not be fair use.

12               Well, if Gorman talks to Shade about possibly using

13   this stuff in an expansive way, to make a commercial or feature

14   film, that doesn't somehow divest Gorman of his rights to fair

15   use, to use the stuff in conformity with the four-factor test,

16   et cetera, et cetera.

17               So I think it's a red herring and it also doesn't

18   divest him from his ownership and authorship of the

19   Congressional documentary.

20               **THE COURT:**  Thank you.

21               **MR. GUPTA:**  And then I'll come back to the motion to

22   dismiss if --

23               **THE COURT:**  I have heard enough about it already in

24   your papers.

25               **MR. GUPTA:**  Okay.

1          THE COURT:  Ms. Yu.

2          MS. YU:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MS. YU:  I hardly know where to start, since I

5  disagree with virtually every point made by --

6          THE COURT:  Well, whatever you do, you need to do it

7  with dispatch.

8          MS. YU:  I will do that, Your Honor.

9          What we have in this case is that over a two-year

10 period of time, Greg Shade shot and filmed the scenes in

11 Afghanistan and Central Asia.

12         There's actually no dispute about the authorship of

13 the camera work or the script.  Defendant Gorman did not film

14 any portion of that in Central Asia.

15         Over 11 minutes of the 19 minutes in American Hero,

16 Gorman's work, comes from plaintiff's registered work that have

17 never previously been shown to the public before.

18         As to plaintiff's video --

19         THE COURT:  Was it part of the thing that was given

20 to the Congress?

21         MS. YU:  It was -- no.  It's never been publicly

22 shown before.

23         I think what the Court is getting at is the issue of

24 publication.  And that -- that issue I will describe as this:

25 Under the Copyright Act, publication is the distribution of

1   copies to the public by sale, transfer, and transfer of

2   ownership.

3           The offering of the -- to distribute copies doesn't

4   necessarily mean, for example, there are limited publications.

5   And the defense has offered no authorities for the

6   conclusions -- their summary conclusions that these were

7   published, just because they are still photographs used in

8   2002, and just because there was a CBS Dan Rather 60 Minutes

9   episode in 2003.

10          In fact --

11          **THE COURT:**  I just need to understand what you have

12   said.  Are you saying that, whatever you said, nine out of 21

13   minutes, or 19, whatever --

14          **MS. YU:**  11 out of 21 minutes -- I'm sorry, less than

15   20 minutes.

16          **THE COURT:**  -- is footage that was not included in

17   the disks that were given to the congressmen, and not included

18   in the disks that were given to Dan Rather and whoever the news

19   outlets were?

20          **MS. YU:**  Your Honor --

21          **THE COURT:**  Is that what you're saying?

22          **MS. YU:**  No.  Let me correct that.  Of the 11

23   minutes, it was definitely not used in the CBS.  It was

24   definitely not used --

25          **THE COURT:**  Was it given to them, is what I want to

1    know?

2         **MS. YU:**  Okay.  It differs.  The answer differs based

3    on what it was.  ABC and CBS did not get any of that material.

4         As to what was given to Congress, I think that's

5    actually unclear in the record.  Phase 1, 2 and 3, which New

6    West produced, not Dan Gorman produced, and that is one of the

7    issues that was the result -- and resulted in the surreply, the

8    issue is that -- and I think that I would direct the Court's

9    attention to limited publications, under the Martin Luther King

10   case, as well as the Burke case, indicate that a limited

11   publication, when you give a clip to either -- whether it's

12   limited to five members of Congress, which were never

13   published, whether you --

14        **THE COURT:**  You're saying it doesn't amount to

15   publication under whatever standards I need to apply under the

16   Copyright Act.

17        My question was different.  It was just, was the

18   material on this ultimate 20 minutes or 19-minute thing, did it

19   include the 11 minutes that you're describing?  Did that

20   include footage that was part of the disks given to the

21   Congress?  That's what I want to know.

22        **MS. YU:**  And I think the answer to that question is

23   it's unclear because we're not a hundred percent sure of --

24   there's nothing in the record that says what specifically was

25   given to Congress.

1          **THE COURT:**  So you can't say it wasn't?

2          **MS. YU:**  Well, and even if it were, the issue is --

3          **THE COURT:**  You're saying it doesn't matter.

4          **MS. YU:**  Right.

5          **THE COURT:**  Okay.

6          **MS. YU:**  I think what is also undisputed is that in

7   the case law relating to fair use, one of the issues that the

8   courts have examined is whether or not the use of it is in good

9   faith.

10          What has happened in this case is that defense has

11   conflated some of these issues of First Amendment.  And -- and

12   what the case authority actually says is quite different.  In

13   Harper, for example, and in many of these cases, the fact is

14   that Gorman only got portions of this because Greg Shade paid

15   him to edit it.

16          One of the cases we provided to the defense only

17   recently was Aalmuhammed vs. Spike Lee.  That's 202 F.3d.  And

18   the jump cite is at 1230 and 1236.  Supplying voice-overs,

19   subtitles, writing script changes.  And this is relating to

20   post production editing, which is what happened with Gorman.

21   Post production editing does not amount to co-ownership.  The

22   law is very clear on that.  And it is not -- Gorman does not --

23   is not entitled to ownership of the phases 1, 2 and 3.

24          And I think there's a question about credibility, as

25   well, since the New West folks indicated they are the ones who

1  created phases 1, 2 and 3.

2          So we think that the Estate of Martin Luther King and

3  Burke are the authority that basically says that the limited

4  publication to Congress -- not Congress, to the five members

5  that he specifically met with, do not constitute a publication.

6          As to each of the factors that Mr. Gupta has

7  indicated, the significance of Gorman's work, no one is

8  challenging Gorman's ability to do anything that's a First

9  Amendment right.

10          What we challenge is his ability to use our client's

11  materials, which he agreed to in advance that he would keep

12  confidential until the parties approved it through the letter

13  of intent.

14          And he states emphatically that this is a case study

15  of Plaintiff Shade.  A case study of plaintiff Shade does not

16  create a parody.  A parody necessarily requires that there's a

17  style that someone is mimicking.  So this is more of a satire

18  than it is a parody.  And since this was never made public, it

19  belies the concept that this could be parody of something

20  that's a known style.

21          The issue is that, also, you know, we've indicated

22  that we do not believe that Gorman is the author of any of it.

23  And if he is the author of anything, he would be the author

24  only of the editing that he says he did.  But that's not what

25  the copyright claim is.  And that's not what this claim is

1   here.

2           The defendant's counsel has indicated that Mr. Shade

3   indicated that they would share with the people.  That's not in

4   the record anywhere.  In fact, it's exactly the opposite.

5           What's in the record is that Mr. Shade was very

6   careful about what he used and what he disclosed, because he

7   was concerned about the identities of not only himself but

8   third parties in Afghanistan.  He thought that the release of

9   the film would cause security issues for those individuals.

10          **THE COURT:**  Where does it say in the letter of

11  intent, which is just a letter of intent --

12          **MS. YU:**  Right.

13          **THE COURT:**  -- of course, that it will be kept

14  confidential?

15          **MS. YU:**  I'm sorry.  That comes from the testimony.

16  But, certainly, it says that the -- the letter of intent says

17  that the final content must be approved by both parties.

18          **THE COURT:**  Right.  It doesn't say anything about

19  confidentiality.

20          **MS. YU:**  You're right, Your Honor.  But both parties

21  testified that Greg Shade was very concerned about the

22  confidentiality of the identities and, actually, of the film

23  footage itself.

24          And as demonstrated by the slam cuts in the actual

25  opposition brief, you can see the slam cuts are not portions

1   that are from the copyrighted -- the registered copyrighted

2   works.  They're either video footage from the hotel room, which

3   our client has testified he was not aware that he was being

4   filmed, against, for example, a Dan Rather piece.

5           So it's not actually a juxtaposition of the

6   copyrighted material.  In other words, the satire of the

7   plaintiff, as opposed to a parody.

8           And then the concept that Congressman Rohrabacher

9   indicated there was mercenary, that's sort of a -- even in Mr.

10  Gorman's own opposition they indicate, for example, that Dana

11  Rohrabacher indicated he was a mercenary without a gun.  And

12  that's indicated in the -- in the -- in the declaration of

13  Mr. Gupta, at Exhibit N.

14          Finally, the defense seems to want to dismiss the

15  letter of intent as having no effect today, that only apply for

16  commercial venture.  I'm not going to reiterate the issues that

17  are stated in our reply brief at page 5, but I would encourage

18  the Court to review that again, because Mr. Gorman's testimony

19  changed at every different -- every time he answered the

20  question.

21          First, he said the LOI only applies if it's a

22  48-minute film.  It only applies if it's a commercial venture.

23  None of which is stated in the actual letter of intent.

24          I think the letter of intent is very clear.  The

25  content had to be mutually agreed upon.

 1            As to the issues relating to what, for the purposes

 2    of preliminary injunction, we believe that Shade -- Plaintiff

 3    Shade meets the requirements of the preliminary injunction

 4    because there is a substantial likelihood of success on the

 5    merits, particularly in light of the bad faith component in the

 6    letter of intent.

 7            It's just like Harper, when the nation knew it was

 8    purloining a manuscript.  It's similar to Sallenger (phonetic),

 9    where the biographer knew that Sallenger did not want his

10    biography published during his lifetime, and knew that he did

11    not want to have his letters published.

12            And in Sallenger, similarly, the fact that the

13    letters were available at the university libraries for anyone

14    to check out did not constitute a publication.

15            Just like in Roy vs. CBS, the argument is that in

16    Roy, where there's a Charlie Chapman film, CBS got permission

17    to use it for a limited purpose.  CBS got permission from the

18    Chaplin -- the people who own the Chaplin movies, to use it for

19    the purposes of an Academy Award tribute.

20            And at the point that Charlie Chaplin died, CBS, even

21    though it was very clear in their contract that that was a

22    one-time use only, for the Academy Awards, they then went and

23    used portions of it in the tribute.

24            Which the Court then said -- and to be clear, that

25    happened under the JNOV.  It wasn't in the context of a

1  preliminary injunction.  But that's another example.

2          The Court has consistently looked at the bad faith

3  component when it comes to how the defendants have used and how

4  they came to access the particular copyrighted material.

5          The final thing I would say as to balance and

6  hardship, it cannot be hardship for defendants because they

7  previously agreed under the LOI that they would get the consent

8  and approval of Greg Shade before they produced any film.

9          **THE COURT:**  Thank you.  The matter will be submitted

10  and you will hear from me.

11          Do we have a status today?

12          **MR. CROSS:**  This afternoon, Your Honor.

13          **THE COURT:**  I think it would be more profitable for

14  us all to have that in a week or two's time, when I can sort

15  out exactly what I'm going to do here.  I think you'll be

16  better able then to gauge what the next step needs to be.  My

17  suggestion is that we continue that probably until like the

18  early part of January.

19          **THE CLERK:**  Actually, probably have to be

20  January 30th, because we're just really booked.

21          **THE COURT:**  How does January 30th look for you?

22          **MR. GUPTA:**  That's fine, Your Honor.

23          **THE CLERK:**  Okay.

24          **MR. CROSS:**  Should be fine.

25          **THE COURT:**  That would be Friday, January 30th.

1   2 o'clock in the afternoon.  All right.  Thank you.

2              MR. CROSS:  Thank you.

3              MR. GUPTA:  Thank you, Your Honor.

4              (At 10:42 a.m. the proceedings were adjourned.)

5                          -  -  -  -

6

7                    **CERTIFICATE OF REPORTER**

8         I certify that the foregoing is a correct transcript

9   from the record of proceedings in the above-entitled matter.

10

11  DATE:   Wednesday, December 24, 2008

12

                    s/b Katherine Powell Sullivan
13          _____

14         Katherine Powell Sullivan, CSR #5812, RPR, CRR
                         U.S. Court Reporter
15

16

17

18

19

20

21

22

23

24

25